# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | |
|          Plaintiff, | No. CR-04-2043 TUC RCC (JM) |
| v. | **REPORT AND RECOMMENDATION** |
| William S. Nestle, | |
|          Defendant. | |

This matter was referred to Magistrate Judge Marshall for all pretrial matters. A Motion to Suppress Evidence and Motion to Suppress Statements [Docket No. 19] filed by Defendant William S. Nestle was heard by Magistrate Judge Marshall on May 11 and 12, 2006. The Defendant was present at the hearing and was represented by counsel. Four witnesses were presented: Border Patrol Agents Jorge Gonzales, Carlos Landin, Richard Ramirez, and Jason Thomas. The witnesses were examined, cross-examined, and questioned by the Court. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant Nestle's Motions be denied.

**I.   FINDINGS OF FACT**

On August 8, 2004, Border Patrol Agent Jorge Gonzales prepared an alert he sent to other agents via e-mail concerning vehicles and individuals that were suspected of being involved with narcotics trafficking. (TR1:7; Exhibit 1).[1] The alert identified "a couple of

---

[1] "TR1" refers to the Transcript of Motion Hearing dated May 11, 2006, and filed with the Clerk on May 22, 2006. "TR2" refers to the Transcript of Motion Hearing dated May 12, 2006, and

load vehicles out of Arivaca," one of which was a "white Lincoln Town car registered to and driven by William Stanton Nestle . . . ." (TR1:10; Exhibit 1). In the message, Agent Gonzales reported that the identified sedan "was parked in a stash house owned by James William Tilden . . . in Arivaca where we tracked a group of backpackers to that residence and seized 437.2 pounds of marijuana in a cellar." Gonzales further indicated that he had "pictures of the sedan parked at [the stash house], " with the "cellar and marijuana in full view with the sedan in the background." (*Id.;* Exhibits 2 & 3 (photographs)). Agents ran a K-9 on the vehicle and "[m]arijuana and debris was found in the trunk and it also smelled heavily of marijuana. Mr. Nestle was not at the residence at the time, but it is believed that he ran off when [agents] approached the home." (TR1:10; Exhibit 1).

The alert from Agent Gonzales also described an attempted vehicle exchange involving Nestle:

> Two weeks ago I was on my way out of Arivaca nearing Amado when I caught up to the Lincoln driven by Mr. Nestle. He immediately took evasive action. I decided to let him hook himself more so I continued to follow him. He tried to ditch me in Green Valley, not stopping at stop signs and driving behind a gas station and then into the shopping plaza. I then spotted the sedan back north bound on I-19 (he did not have enough time to get out of his car at the shopping center). I caught up to the sedan just north of Papago Road south of Tucson. He continued to take evasive action keeping vehicles between he and I. I was having trouble with my truck and could not keep up with him after that and lost him in traffic on I-10. I am pretty sure that he was driving a load of dope that day.

(Exhibit 1). Agent Gonzales concluded the alert by identifying where Nestle lived and who he might be working for. (*Id.*).

A few days after receiving Agent Gonzales' e-mail alert, Agent Landin conducted a traffic stop of Nestle's white Lincoln Town Car. (TR1:29). Outside of Arivaca, on Arivaca Road, Agent Landin first became interested in a vehicle that appeared to be traveling in tandem with Nestle's. (TR1:29-30). Nestle distracted Agent Landin's attention by driving

---

filed with the Clerk on May 22, 2006.

1  very close to the divider line and preventing the agent from passing and pursuing the other
2  vehicle. (TR1:32). Agent Landin eventually stopped Nestle's vehicle, in which Nestle was
3  the driver and sole occupant. (*Id.*). On initial contact, Nestle became belligerent, using
4  profane language and asking Agent Landin why he stopped him. (*Id.*). After explaining why
5  he was stopped and requesting identification, Agent Landin sought permission to look into
6  Nestle's vehicle. (TR1:32-33). When the agent mentioned that he was going to call a K-9
7  unit, Nestle's attitude changed, and he consented to the search of his vehicle. (TR1:34).
8  Agent Landin searched the trunk of the car and noticed that, while it was completely empty,
9  it did contain a small piece of cellophane and some dirt. (TR1:34-35). Agent Landin
10 allowed Nestle to go on his way. (TR1:35).

11      A few days later, on August 14, 2004, agents were again briefed concerning Nestle.
12 (TR1:93). Nestle's car and the earlier stop by Agent Landin were described and agents were
13 told that the vehicle would leave Arivaca at certain times of the morning. (TR1:93-94). At
14 approximately 10:00 a.m., Agent Landin, along with Agents Richard Ramirez and Jason
15 Thomas, was stationed at Milepost 1 on Arivaca Road outside the town of Arivaca. (TR1:26-
16 27, 73 & 78). Agent Landin was alone in his vehicle with the windows rolled down when
17 he noticed Nestle's white Lincoln Town Car pass his location. (TR1:28-29). As the vehicle
18 passed, Agent Landin was "overwhelmed with the smell of marijuana." (TR1:40 & 61).
19 Agent Ramirez also got a "whiff" of what he believed was marijuana. (TR1:91). Agent
20 Landin recalls that he told Agents Ramirez and Thomas to pursue the vehicle. (TR1:41).
21 Agent Ramirez recalls that he decided to pursue the Lincoln. (TR1:80). In any event, Agent
22 Landin remained where he was so that he could see if there was a scout vehicle traveling with
23 the Lincoln. (*Id.*). After a few seconds, he followed the other agents who were pursuing
24 Nestle's car. (TR1:42). After following Nestle for approximately 7.5 miles, Agent Ramirez
25 activated his overhead lights and Nestle stopped at Milepost 8.5. (TR1:62 & 82).

26      Agent Ramirez questioned Nestle about his immigration status, and because he had
27 smelled marijuana, asked to see Nestle's identification. (TR1:84). At that point, Nestle
28

1  questioned why he had been stopped and became belligerent and irate. (*Id.*). Agent Ramirez
2  then asked Nestle for consent to search the vehicle's trunk. (*Id.*). When Nestle refused to
3  consent, Agent Ramirez told him he would have to wait until a K-9 unit arrived to inspect
4  the vehicle. (*Id.*; TR2:133).

5  Agent Landin, who had seen the stop take place, arrived and also approached Nestle's
6  vehicle. (TR1:42-43). He observed Nestle sitting in the driver's seat of the Lincoln "cussing
7  at the agents" and refusing to consent to a search of his car. (*Id.*). Smelling marijuana, Agent
8  Landin suggested that a K-9 unit be called to conduct a sniff. He then called the Nogales
9  checkpoint to make the request. (TR1:44). When the K-9 arrived approximately 20 minutes
10 later, Nestle reached for his keys, said "Oh, hell you're going to find out what's in there
11 anyway," and volunteered to open the trunk for inspection. (TR1:44, 52-53, 66 & 85;
12 TR2:134). Agents discovered bundles of cellophane wrapped marijuana in the trunk. (*Id.*;
13 Exhibits 4 & 5 (photographs of the marijuana)).

14 After the marijuana was discovered, Agent Landin handcuffed and advised Nestle of
15 his Miranda rights by reading them to him from a card. (TR1:50-52 & 67; TR2:135; Exhibit
16 6 (rights card)). Nestle was silent but indicated he understood his rights. (TR1:52). Nestle
17 was asked a few questions but he did not respond. (TR1:54). Nestle then began to feel a
18 little ill. (TR1:86). Prompted by this and his anticipation that Nestle would be detained,
19 Landin asked Nestle if he had medications in his possession and if he had any other
20 prescriptions. (TR1:46 & 86-87). Nestle indicated that he had medications at home and
21 agreed to go with the agents to retrieve them. (TR1:47; TR2:136).

22 Agents Landin, Thomas and Ramirez then drove Nestle to his residence. (TR1:47 &
23 90). Nestle was told that he was under arrest and that, if he went into the home, it would be
24 necessary for agents to accompany him inside. (TR1:47-48). For officer safety, both Agent
25 Landin and Agent Thomas accompanied Nestle into the home. (TR1:47). Once inside,
26 Agent Landin immediately observed "a pile of bundles being concealed under a blanket."
27 (TR1:48). Agent Ramirez, who remained at the doorway, and Agent Thomas also saw the
28

4

bundles. (TR1:90; TR2:143). The pile of bundles was uncovered a few inches from the bottom and the agents could see cellophane packages marked "TIBU," which was the same marking on the bundles they had discovered in Nestle's trunk. (TR1:48-49). Nestle then stated, "It's too bad it's illegal." (TR2:141). Nestle was then reminded of his rights and affirmatively invoked his right to silence by stating that he did not want to speak anymore. (TR1:54; TR2:140-141).

## II.   CONCLUSIONS OF LAW

### A.   Legality of the Stop

Nestle alleges that reasonable suspicion did not exist to support the stop of his car. The Fourth Amendment protects the right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures. *U.S. v. Hensley*, 469 U.S. 221, 226 (1985). In *Terry v. Ohio*, 392 U.S. 1, 88 (1968), the Supreme Court held that, consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances. The Court has held that law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *Hensley*, 469 U.S. at 226.

Reasonable suspicion exists when an officer is aware of specific articulable facts, that, together with rational inferences drawn from them, reasonably warrant a suspicion that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-18 (1981). When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The articulable facts forming the basis of a reasonable suspicion must be measured against an objective reasonableness standard, not by the subjective impressions of a particular officer. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1445 (9th Cir.1994).

Here, prior to stopping Nestle's car, agents had reliable intelligence that Nestle was involved in narcotics trafficking. Agent Gonzales had photographs of a cellar containing

over 400 pounds of marijuana; Nestle's vehicle was pictured in the background. Agent Gonzales described a thwarted vehicle exchange involving Nestle and Nestle's previous successful evasion of authorities. Additionally, agents were briefed the day of the stop and were told to be on the lookout for Nestle's vehicle. Field intelligence of this sort is properly considered in determining reasonable suspicion. *See, e.g., United States v. Thompson*, 282 F.3d 673, 675 (9th Cir. 2002); *United States v. Tiong*, 224 F.3d 1136, 1139 (9th Cir. 2000). More importantly, just prior to stopping Nestle's car, both Agents Landin and Ramirez smelled marijuana as Nestle passed them at Milepost 1 on Arivaca road. When considered in conjunction with the characteristics of the area and its proximity to the border, Agents clearly established reasonable suspicion to initiate a vehicle stop.

**B.   Legality of the Search**

Nestle contends that he did not consent to the search of his home. In support of his contention, Nestle refers to a report prepared by Agent Thomas, which states:

> SBPA Landin advised [Nestle] that we would need to go to his house in order to get these medications as he may be detained for an unknown period of time. SBPA Landin advised him that himself and I would be going into the house with him as he was in our custody. He agreed, unlocked the house and we went in.

*Motion to Suppress*, Exhibit C.

Nestle contends this passage establishes that the agents request to accompany Nestle to his house to retrieve his medication was required or mandatory. *See United States v. Stevens*, 206 F.3d 914, 917-18 (9th Cir. 2000). The record as a whole, however, does not support this contention.

While the Court agrees that the phrase "need to go" could be construed as mandatory, Agent Thomas' report that Nestle "agreed, unlocked the house and we went in" blunts the assertion that Nestle was required to go to the house and allow agents inside. Furthermore, when questioned at the hearing on this issue, the agents were uniformly asserted that Nestle was given a choice to go to his house. (TR1:47; TR2:137). In fact, Agent Landin testified

6

that he told Nestle that they could either obtain a prescription for him *or* retrieve the medication from his home. (TR1:47). The Court finds that Nestle voluntarily consented to the agents' entry into his home for the purpose of retrieving his medication.

Nestle argues that, even if he did consent to the entry of the agents into his home for the purpose of obtaining his medications, the agents exceeded the scope of the consent by conducting a search of the home. This contention is without merit. "When an official search is properly authorized - whether by consent or by the issuance of a valid warrant - the scope of the search is limited by the terms of its authorization." *Walter v. United States,* 447 U.S. 649, 656 (1980). Providing keys to a residence is evidence of consent to a search, particularly when coupled with a request for police to retrieve items from within or assist in their retrieval. *United States v. Gilbert,* 774 F.2d 962, 963 (9th Cir. 1985) (per curiam); *United States v. Donlin,* 982 F.2d 31, (1st Cir. 1992). More importantly in this case, the bundles of marijuana were in plain view to the officers when they entered Nestle's home. Because the agents were lawfully present and the illegal nature of the bundles was immediately apparent, the agents were justified in seizing them under the "plain view" doctrine. *Coolidge v. New Hampshire,* 403 U.S. 443, 466 (1971) ("the 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object."); *see also, United States v. Bulacan,* 156 F.3d 963, 968 (9th Cir1998).

### C.    Voluntariness of the Statements

Nestle contends that his post-arrest statements are subject to suppression because he was improperly questioned in violation of his Miranda rights. Specifically, Nestle asserts that he was questioned at the scene of the stop and at his home after he had invoked his right to remain silent. The record does not support his contention. The agents testified that, at the scene of the stop, Nestle stated something to the effect of "Oh, hell you're going to find out what's in there anyway." This statement was made prior to Nestle's arrest and before he was

advised of his rights. At the residence, Nestle stated, "Too bad, it's illegal." Neither of these statements was made in response to questioning by the agents. Spontaneous and voluntary statements such as these, that are not the product of police interrogation or its functional equivalent, are admissible regardless of whether the individual was warned of his rights. *Miranda v. Arizona,* 384 U.S. 436, 478 (1966).

In his motion, Nestle also urges the Court to suppress other statements he allegedly made to the agents when he was at the residence and after he had affirmatively invoked his right to remain silent. This issues involving these statements was resolved by counsel during the hearing, with the Government stipulating that it would not offer these statements at trial. (TR2:142, 156 & 164)

### III.    RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule – Civil 72.1, Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** the Motion to Suppress Evidence and Motion to Suppress Statements [Docket No. 19] filed by Defendant William S. Nestle.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CR 04-2043-TUC-RCC**. Failure to timely file objections to any factual or legal determination of the Magistrate

Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 12th day of June, 2006.

_____
Jacqueline Marshall
United States Magistrate Judge